## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| EVE BERKSON, on behalf of herself and all others similarly situated, | ) ) ) | **Case No. 10-CV-9386 (UA)** |
| Plaintiff, | ) ) | **CLASS ACTION COMPLAINT** |
| vs. | ) ) | **JURY TRIAL DEMANDED** |
| JPMORGAN CHASE & CO., J.P. MORGAN CLEARING CORP., J.P. MORGAN SECURITIES INC., J.P. MORGAN FUTURES INC., HSBC HOLDINGS PLC, HSBC SECURITIES (USA) INC., and HSBC BANK USA, NATIONAL ASSOCIATION, | ) ) ) ) ) ) ) | **ECF CASE** |
| Defendants. | ) ) | |

Plaintiff Eve Berkson, on behalf of herself and all others similarly situated, brings this action against JPMorgan Chase & Co., J.P. Morgan Clearing Corp.; J.P. Morgan Securities Inc.; J.P. Morgan Futures Inc. (collectively, "JPMorgan"); HSBC Holdings PLC; HSBC Securities (USA) Inc., and HSBC Bank USA, National Association (collectively, "HSBC") (together with JPMorgan, "Defendants") and alleges as follows:

### NATURE OF CLAIM

1.      This action arises from Defendants' conspiracy to intentionally and unlawfully suppress and manipulate the price of Commodity Exchange, Inc. ("COMEX") silver futures and options contracts between June 1, 2008 and the present, in violation of Section 22(a)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25(a)(1) and Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      As alleged herein, during the Class Period (defined below) Defendants conspired to and did suppress and manipulate the prices of COMEX silver futures and options contracts by

amassing enormous short positions in COMEX silver futures contracts.  Defendants utilized their heavily concentrated positions in COMEX silver futures contracts to suppress the price of COMEX silver futures and options contracts on numerous occasions each month throughout the Class Period, including at or around the time of Options Expiry (defined below).

3.      Defendants reaped hundreds of millions of dollars, if not billions of dollars in profits from their unlawful and manipulative suppression of the prices of COMEX silver futures and options contracts.

4.      Numerous allegations contained herein, particularly with respect to the mechanics of Defendants' unlawful conspiracy and manipulation, are based on the information provided and personal knowledge of a whistleblower, a former employee of Goldman Sachs in that firm's London office (hereafter, the "Whistleblower").

5.      In September 2008, the Enforcement Division of the Commodity Futures Trading Commission ("CFTC") commenced an investigation into manipulation in the silver market.  The CFTC said in a report that year that it had received "numerous letters, e-mails and phone calls" alleging that silver futures prices were being unlawfully manipulated downward.

6.      In November 2009, the Whistleblower contacted the CFTC and reported Defendants' illegal conspiracy to manipulate and suppress the prices of COMEX silver futures and options contracts.

7.      In his communications with the CFTC, the Whistleblower described how JPMorgan silver traders signaled market participants in advance of their manipulation, so that they, along with other traders, could reap enormous profits by artificially and unlawfully suppressing and manipulating the price of COMEX silver futures and options contracts.

8.      In subsequent communications, the Whistleblower informed the CFTC that he had observed JPMorgan signal the market that it intended, with others, to reduce and suppress the price of COMEX silver futures contracts, including at or around the date in which options (whose value derives from the underlying price of COMEX silver futures contracts) were scheduled to expire ("Options Expiry").  The Whistleblower then sent the CFTC "real-time" emails in which he predicted Defendants' price suppression activities, noting that it would not be possible for him to have such accurate, advance information about this unlawful market suppression if the COMEX silver futures and options contracts markets were not being unlawfully manipulated.

9.      In March 2010, the Whistleblower publicly disclosed his cooperation with the CFTC and released his emails predicting the market suppression of COMEX silver futures and options contracts.

10.     Upon information and belief, Defendants thereafter began to unwind their massive short positions.  As reflected in the CFTC Bank Participation reports[1], the net short position of silver futures held by commercial banks, of which Defendants comprise the vast majority, have been reduced by more than 30% since March 2010.

11.     As Defendants' short position in Comex Silver Futures contracts have decreased, the price of silver has risen dramatically.  Silver has gained 40 percent this year, touching $24.95 an ounce on October 14, its highest level in 30 years.

---

[1]   The CFTC Bank Participation Reports provide statistical data on the number of COMEX silver futures contracts and relative positions taken by U.S. and foreign banks.  Until November 2009, the CFTC Bank Participation Reports provided the number of U.S. and foreign banks that traded in COMEX silver futures contracts for a given month.  Pursuant to applicable commodities law, which prohibits the CFTC from disclosing the identity and positions of commodity traders to the public, the CFTC Bank Participation Reports do not reveal the names of the banks that trade in COMEX silver futures contracts.  In November 2009, the CFTC decided to stop publishing the number of commercial banks for markets, such as COMEX silver futures contracts, where fewer than five banks participate.

12.     In light of the Whistleblower's allegations, the CFTC has focused its investigation on manipulation in both the physical silver market and COMEX silver futures market.  The investigation is far-ranging, with federal law enforcement officials investigating, among other things, JPMorgan and others' COMEX trades in silver futures and options contracts as well as its trades on the London Bullion Market Association's Exchange, which is the physical delivery market for silver.

13.     On October 26, 2010, CFTC Commissioner Bart Chilton[2] announced that there have been "violations of the Commodity Exchange Act in the silver market."  Specifically, Commissioner Chilton concluded, "[t]here have been fraudulent efforts to persuade and deviously control" prices in the silver market, which "should be prosecuted."  Commissioner Chilton indicated that the CFTC investigation was continuing and added that he was "hopeful that the agency will speak publicly about the investigation in the very near future."

14.     Defendants devised and executed their scheme to manipulate and suppress the prices of COMEX silver futures and options contracts to benefit their financial positions which were tied to a decrease or suppression in the futures price of silver.  Put simply, Defendants bet that prices of silver and silver futures contracts would decrease or be suppressed during the Class Period.  But this was not really a bet at all because, through their illegal manipulation and other anticompetitive activities, Defendants virtually guaranteed that the price of COMEX silver futures and options contracts would decrease or be suppressed.

15.     Defendants' manipulative and anticompetitive trading activity directly caused and resulted in the intentional unlawful manipulation and suppression of the prices of COMEX silver futures and options contracts during the Class Period.

---

[2]   The CFTC consists of five commissioners appointed by the President to serve staggered five-year terms.

16.     Defendants' conspiracy to manipulate and suppress the prices of COMEX silver futures and options contracts violates Section 22 of the CEA, 7 U.S.C. §25 and Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiff and members of the Class suffered damages by trading COMEX silver futures and options contracts at artificial prices during the Class Period, as more fully alleged herein.

17.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## JURISDICTION AND VENUE

18.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26,  and Section 22 of the CEA, 7 U.S.C. § 25.

19.     This Court has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. §§ 1331 and 1337.

20.     Venue is proper in this District pursuant to 15 U.S.C. § 15(a), Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. § 1391(b), (c) and (d).  Defendants resided, transacted business, were found, or had agents in the District and/or the claims arose at least in part in the District.

## PARTIES

21.     Plaintiff Eve Berkson is a resident of the state of Oregon.  During the Class Period, Ms. Berkson traded COMEX silver futures and options contracts, and was injured as a result of Defendants' anticompetitive acts and market manipulation.

22.     For example, Ms. Berkson purchased COMEX silver call contracts on March 17, 2008 and July 18, 2008, during which time the price of physical silver fell from $76.50 to $31.20.

23.     Defendant JPMorgan Chase & Co. is a Delaware financial holding company with its principal place of business in New York, New York.  JPMorgan Chase & Co. is a leading global financial services firm and one of the largest banking institutions in the United States with $2.1 trillion in assets, $164.7 billion in stockholders' equity, and operations in more than 60 countries.

24.     Defendant J.P. Morgan Clearing Corp. ("JPMC"), formerly known as Bear, Stearns Securities Corp. is a Delaware corporation with its corporate offices in Brooklyn, New York.  JPMC is a subsidiary of J.P. Morgan Securities Inc. which is a wholly owned subsidiary of JPMorgan Chase & Co.  JPMC is a registered Futures Commission Merchant with the CFTC.

25.     Defendant J.P. Morgan Securities Inc. ("JPMS") is a Delaware corporation with its principal place of business in New York, New York.  JPMS is a wholly owned subsidiary of JPMorgan Chase & Co.  JPMS, through JPMC, provides securities and futures clearing, customer financing, securities lending and related services.

26.     Defendant J.P. Morgan Futures Inc. ("JPMFI") is a Delaware corporation with its principal place of business in New York, New York.  JPMFI is a U.S. futures commission merchant and wholly owned subsidiary of JPMorgan Chase & Co.  JPMFI provides research, sales, execution and clearing services in futures and options across fixed income, equity, foreign exchange and commodity asset classes.  JPMFI holds the U.S. accounts of JPMorgan Chase's global futures and options business customers.

27.     Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public limited company with its corporate headquarters in London, England.  As of 2009, HSBC Holdings was the world's largest banking group and the world's sixth largest company according to Forbes Magazine.

28.     Defendant HSBC Securities (USA) Inc. ("HSBC USA") is a Delaware corporation with a corporate office located in New York, New York.  HSBC USA is a wholly owned subsidiary of HSBC Markets (USA) Inc. whose ultimate parent is HSBC Holdings plc. HSBC USA is a registered broker-dealer of securities under the Securities Exchange Act of 1934 and is a registered Futures Commission Merchant with the CFTC.

29.     Defendant HSBC Bank USA, National Association ("HSBC NA") is a Texas company with an office in Wilmington, Delaware.

## UNNAMED CO-CONSPIRATORS

30.     Various other entities and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of and performed acts and made statements which aided and abetted and was in furtherance of the unlawful conduct.

## THE RELEVANT MARKET

31.     The relevant market, which was the target of Defendants' anticompetitive and unlawful scheme, is COMEX silver futures and options contracts.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and others similarly situated.  The "Class" is defined as:

> All persons or entities other than Defendants and their employees, affiliates, parents, subsidiaries or co-conspirators (whether or not named in this Complaint) who transacted in COMEX silver futures or options contracts between June 1, 2008 through such time as the effects of Defendants' illegal conduct ceased.

33.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of the Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members traded COMEX silver futures and options contracts during the Class Period.

34.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

35.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including commodity manipulation and antitrust class action litigation.

36.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether Defendants conspired with others to artificially depress and manipulate the price of COMEX silver futures and options contracts in violation of the Sherman Act;

(b)     Whether Defendants' conduct, which manipulated and suppressed the prices of COMEX silver futures and options contracts, violates the CEA;

(c)     Whether Defendants' conduct had an anticompetitive and manipulative effect on the prices of COMEX silver futures and options contracts purchased or sold by Plaintiff and the Class during the Class Period; and

(d)     The appropriate measure of damages, under the CEA and federal antitrust laws, sustained by Plaintiff and other members of the Class as a result of Defendants' unlawful activities.

37.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

38.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

I.     **Background**

    A.     **Overview of COMEX Silver Futures and Options Contracts**

    39.     Silver futures contracts and silver options contracts are traded on COMEX.

    40.     COMEX, a division of the New York Mercantile Exchange ("NYMEX"), has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  COMEX submits to the CFTC various rules and regulations for approval through which COMEX designs, creates the terms of, and conducts trading in various precious metals futures and options contracts, including futures and options contracts for silver.  COMEX is an organized, centralized market that provides a forum for trading silver futures and options contracts.

    41.     COMEX provides standardized silver futures contracts with delivery dates commencing with the next calendar month and potentially extending as far as 60 sequential months into the future depending upon the month in which the contract was executed.  A silver futures contract is an agreement to buy or sell a fixed amount of silver at a date in the future.  The COMEX specifies the terms of trading, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

    42.     Trades of silver futures contracts on the COMEX have two "sides."  The "long" side represents the buyer of a contract who is obligated to pay for the silver and take delivery.  The "short" side represents the seller of a contract who is obligated to receive payment for the silver and make delivery.  If a market participant holds its position to the end of the settlement period for a silver futures contract, the market participant is obligated to "go to delivery."  That is to say, upon the settlement date, the "futures" contract for a particular month becomes a present contractual obligation for the purchase and sale of the physical silver.  Longs must take

delivery and shorts must make delivery of 5,000 troy ounces per contract over the course of the contract month. The price for the silver that goes to delivery is the "settlement price" of the COMEX silver futures contract.

43.     Only a small percentage of all futures contracts traded each year on COMEX and other exchanges result in actual delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a silver futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of silver by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

### B.     Short Option Positions

44.     There are a number of ways to "go short," *i.e.*, bet that the price of silver will decrease. As discussed above, one can sell a futures contract which confers upon the seller an obligation to deliver silver at a pre-specified date in the future at a pre-specified price. Alternatively, one can sell call options, which confers upon the buyer of the call option the right, but not the obligation, to purchase silver from the seller at a pre-specified "strike price" at some date in the future (*i.e.*, expiry). At expiry, if the price of silver exceeds the strike price, the buyer will exercise the option, which means the seller will pay the difference between the prevailing price and the strike price. Conversely, if the price of silver falls short of the strike price, the option expires "out of the money."

45.     In the cases above (or any other method in which an entity creates a short position), the entity that is short benefits as prices fall. In the case of selling a futures contract, the seller at time of contract expiration simply offsets his position by purchasing a futures contract and pockets the difference in prices. In the case of a call option, the seller benefits if the

prevailing price is below the strike price because it collects the option premium and pays nothing to the purchaser.

46.     Upon information and belief, during the Class Period, Defendants had net short positions in silver options contracts, including but not limited to, the sale of call options.

## C.     Physical and Futures Prices for the Underlying Physical Commodity are Directly Related to One Another

47.     The futures price is the market's consensus of the expected spot price for the underlying physical commodity at a specified future date.  Because the futures price is nothing more than an expectation of the future spot price, both futures and physical prices must be and are, in fact, correlated.  For example, if the futures price in a contract negotiated today for delivery next month starts to rise, this indicates that the market believes spot prices will rise next month.  The rise in the future price for next month delivery will cause a reaction today among producers and consumers of the commodity.

48.     For the producers of the commodity, the increase in the price of that commodity for delivery next month makes it more profitable to shift sales from the current month to the next month.  Conversely, for buyers of physical silver, the increase in price for delivery next month creates an incentive for them to purchase today rather than waiting until next month when the price increase is expected.  Thus, the increase today in futures price (for delivery next month) has caused producers to decrease the available supply of the commodity and prompted buyers of physical silver to increase their demand. The decrease in supply coupled with the increase in demand, causes today's spot prices for the commodity to increase.  The same causal economic story (albeit in reverse) prevails if futures prices decline.

49.     Therefore, changes in futures prices for delivery months into the future have tangible effects on physical spot prices today.  Put statistically, futures prices and physical spot prices are linked and correlated.

## II.     Through Their Enormously Concentrated Short Positions, Defendants Had the Power to and Did Suppress COMEX Silver Futures and Option Contract Prices

### A.     The COMEX Silver Futures and Options Contracts Market is Susceptible to Collusion

50.     The silver futures market is a thin market.  The number of futures contracts traded in the silver market is small, *i.e.*, thin, in comparison to markets involving other commodities. For instance, in August 2008, there were only 129,240 open interest silver futures contracts, *i.e.*, silver futures contracts that had not yet settled, as opposed to 1.25 million open interest NYMEX Light Sweet Crude Oil futures contracts and 408,430 open interest COMEX gold futures contracts during the same period.

51.     The relatively sparse number of silver futures contracts regularly traded on COMEX enabled large banks, such as Defendants, to manipulate the price of silver futures contracts during the Class Period by flooding the market with a disproportionate number of contracts.

52.     In addition, the market for COMEX silver futures and options contracts is highly concentrated with only a handful of very large banks controlling a dominant number of futures and options contracts.

53.     In August 2008, subsequent to JPMorgan's acquisition of Bear Stearns, Defendants JPMorgan and HSBC controlled over 85% of the commercial net short position in COMEX silver futures contracts and 25% of all open interest short positions.

54.     In the first quarter 2009, HSBC NA held 40% of all precious metals derivatives (excluding gold) held by commercial banks.

55.     As of the first quarter 2009, Defendants owned more than 96 percent of all precious metal derivatives held by U.S. banks (excluding gold) with a combined notional value of $7.9 billion.[3]

56.     As one prominent silver trader publicly commented:

> In studying the micro-price movement personality of the COMEX silver market, I can tell you that it behaves like no other market. The typical available liquidity in the deck is tiny, yet we have average daily volume in excess of 40,000 contracts. And as a result, there is significant price volatility for the market to absorb large orders. The existence of oversized market participants has a chilling effect on market makers, which results in even less liquidity as market makers widen their prices to compensate for the increased risks they are taking. Consequently, the large orders wind up setting prices, rather than the proper function of the futures markets to discover prices.

**B.      The Collapse of Bear Stearns Sets the Stage for Defendants' Collusion**

57.     In March 2008, JPMorgan purchased Bear Stearns which, upon information and belief, had amassed a significant short position in COMEX silver futures and options contracts.

58.     Once JPMorgan acquired Bear Stearns commodities portfolio, which upon information and belief, included a substantial net short position in silver futures and options contracts, JPMorgan was faced with one of two choices: (i) it could cover the outstanding short positions it inherited by purchasing offsetting long positions, thus causing the price of silver to rise and exposing it to substantial losses; or (ii) it could purchase additional short contracts in the hope that the price of silver decreased.  Given JPMorgan's significant market power in an already thin, concentrated market, JPMorgan knew that it could undertake massive short

---

[3]     The "notional value" is the value of a derivative's underlying asset as determined by the asset's spot price. In the case of an options or futures contract, the notional value is the number of units of the asset underlying the contract multiplied by the spot price of the asset.

positions with relatively little or no risk.  This was particularly true since it knew that HSBC, and others, would follow its lead.

59.     By August 5, 2008, Defendants were short a massive 33,805 contracts, or more than 169 million troy ounces of silver.  Incredibly, Defendants took no corresponding long positions.  This short position was equal to an astounding 25% of annual world mine production of silver.

60.     Defendants have consistently maintained their massive short positions at critical times throughout the Class Period, controlling significantly more than 25% of open interest in such positions.  This stands in stark contrast to foreign banks whose short positions in COMEX silver futures contracts have been consistently less than 5% of open interest in these positions.

61.     Defendants' concentrated short position in silver futures contracts far exceeds that of the notorious Hunt Brothers who settled charges with the CFTC stemming from their manipulation of the silver market.[4]

62.     A review of the Office of Comptroller of the Currency's Quarterly Report on Bank Derivatives Activities for the first quarter of 2009, which provides information on the value of derivative contracts for the top five commercial banks and trust companies, reveals that, together, JPMorgan and HSBC controlled 96% of all precious metals derivative contracts besides gold (which include silver).

---

[4]     In the 1970s, Nelson Bunker Hunt and William Herbert Hunt, two heirs to an oil fortune, attempted to corner the silver market, eventually accumulating long positions in almost 10 percent of the known world supply of silver.  In 1985, the Hunt Brothers were charged by the CFTC with manipulating and attempting to manipulate the prices of silver futures contracts and silver bullion during 1979 and 1980.  The brothers eventually settled with the CFTC and filed for bankruptcy.

63.     Upon information and belief, Defendants have maintained a market share in excess of 90% of all precious metals derivative contracts excluding gold throughout the Class Period.

**III.    The CFTC's Investigation of Defendants' Conspiracy to Manipulate the Price of COMEX Silver Futures Contracts and Options**

64.     In September 2008, the Commodity Futures Trading Commission ("CFTC") commenced an investigation into manipulation in the silver market after receiving "numerous letters, e-mails and phone calls" alleging that silver futures prices were being manipulated downward.

65.     In November 2009, the Whistleblower contacted the CFTC Enforcement Division and reported Defendants' illegal conspiracy to manipulate and suppress the prices of COMEX silver futures and options contracts.

66.     In his communications with the CFTC, the Whistleblower described how JPMorgan silver traders signaled market participants in advance of their manipulation, so that they, along with other traders, could reap enormous profits by artificially and unlawfully suppressing and manipulating the price of COMEX silver futures and options contracts.

67.     In subsequent communications, the Whistleblower informed the CFTC that he had observed JPMorgan signal the market that it intended, with others, to reduce and suppress the price of COMEX silver futures contracts, including at or around the date of Options Expiry.

68.     According to the Whistleblower, JPMorgan sent "signals" to HSBC and other co-conspirators prompting them to join JPMorgan's artificial suppression and manipulation of the price of COMEX silver futures and options contracts by flooding the market with short positions.

69.     These "signals" were sent on a monthly basis on or around the dates of certain key events, including:  (a) following the United States Department of Labor's issuance of Non-

Farm Payroll Reports[5], which are released during the first week of each month; (b) at the time of Options Expiry[6] on the last four business days of each month; and (c) during COMEX silver futures contract roll-over.[7]

70.    Additionally, the Whistleblower described signals that Defendants employed on a daily basis which the Whistleblower characterized as the "daily fix."   During certain times of the day (typically when trading volume on the COMEX is light), Defendants rapidly dumped large numbers of COMEX silver futures contracts at or around the same suppressed price.   It was understood among Defendants and their co-conspirators that the price of these contracts would set the direction of silver futures contracts prices for that day.   As the Whistleblower explained in an email to Eliud Ramirez, Senior Investigator for the CFTC's Enforcement Division, dated January 26, 2010:

> As an example, if you look at the trades just before the pit open today you will see around 1,500 contracts sell at once where the bids were tiny by comparison in the fives and tens.  This has the immediate effect of gaining $2,500 per contract on the short positions against the long holders, who lose that in moments and likely were stopped out.

71.    The Whistleblower's statements concerning the "daily fix" are corroborated by Jeffrey Christian, Managing Director and founder of CPM Group, a commodities research and consulting company in New York.   Christian recently testified before the CFTC that "there are times when companies enter the market with large trades during the New York pre-market,

---

[5]    The Non-farm Payroll Report is an influential statistic and economic indicator released monthly by the United States Department of Labor as part of a comprehensive report on the state of the labor market.

[6]    The expiration date of an options contract, a.k.a., Options Expiry, is the day on which an options contract is no longer valid and, therefore, ceases to exist.  Because Defendants held net short positions in silver options contracts, Defendants profited by driving down the price of COMEX silver futures contracts.  Indeed, by depressing the price of COMEX silver futures contracts, Defendants assured themselves that the long options contracts opposite their positions would expire out of the money.  Since the options expired worthless, traders who owned the positions opposite to Defendants did not exercise their options and Defendants reaped a profit.

[7]    Contract rollover occurs each month when a futures contract holder exchanges (rolls over) an expiring contract position for a contract position which expires at a later date.

*apparently with the intention of moving prices in their favor by placing a large order or orders before the liquidity is there to accommodate such trades*."  (emphasis added)

72.    In a subsequent email to Ramirez, dated February 3, 2010, the Whistleblower informed the CFTC that he had received a signal from Defendants indicating their intent to depress the prices of COMEX silver futures and options contracts two days later, at or around the time of the announcement of the Non-Farm Payroll Report.  The Whistleblower then predicted how the manipulation would play out in an email:

> Scenario 1.  The news is bad (employment is worse).  This will have a bullish effect on gold and silver as the U.S. dollar weakens and the precious metals draw bids, spiking them higher.  This will be sold into within a very short time (1-5 mins) with thousands of new short contracts being added, overcoming any new bids and spiking the precious metals down hard, targeting key support levels.

> Scenario 2.  The news is good (employment is better than expected).  This will result in a massive short position being instigated almost immediately with no move up.  This will not initially be liquidation of long positions but will result in stops being triggered, again targeting key support levels.

> Both scenarios will spell an attempt by the two main short holders [JPMorgan and HSBC] to illegally drive the market down and reap very large profits.  Locals such as myself will be "invited" on board which will further add downward pressure.

73.    On February 5, 2010, the Whistleblower emailed Ramirez "to confirm that the silver manipulation was a great success and played out EXACTLY to plan as predicted . . ."  Indeed, as the chart below illustrates, the price of silver fell dramatically on February 3, 2010 following Defendants' manipulation just as the Whistleblower had predicted.



74.     The Whistleblower added, "[h]ow would this be possible if the silver market was not in the full control of [JPMorgan and HSBC] . . . I hope you took note of how and who added the short sales (I certainly have a copy) and I am certain you will find it is the same concentrated shorts [JPMorgan and HSBC] who have been in full control since [JPMorgan] took over the Bear Stearns position."

75.     In March 2010, the Whistleblower went public with his allegations and revealed his emails to the CFTC predicting certain market movements.

76.     Upon information and belief, Defendants began to unwind their massive short positions shortly thereafter.  As reflected in the CFTC Bank Participation reports, the net short position of silver futures held by commercial banks, of which Defendants comprise the vast majority, have been reduced by more than 30% since March 2010.

77.     As Defendants' short position in COMEX Silver Futures contracts have decreased, the price of silver has risen dramatically.  Silver has gained 40 percent this year, touching $24.95 an ounce on October 14, its highest level in 30 years.

78.     According to an October 27, 2010 article published in the *Wall Street Journal*, The CFTC's enforcement staff has circulated a packet of information to CFTC lawyers and commissioners, outlining some of its findings in the silver probe, including documents that could suggest there have been attempts to manipulate prices.

79.     According to the same article, CFTC lawyers have interviewed employees of JPMorgan in its metals-trading business as well as industry traders, commodity executives, experts and employees of other metals-trading firms.

80.     The article also cites a CFTC weekly report for October 19, the most recent period, showing that less than four market players hold 24.3% of all net bearish bets in the silver market.  Importantly, relying on silver traders and a person close to the investigation, the article confirms that Defendants JPMorgan and HSBC are among those market participants.

81.     On October 26, 2010, CFTC Commissioner Bart Chilton announced that there have been "violations of the Commodity Exchange Act in the silver market."  Specifically, Commissioner Chilton concluded, "[t]here have been fraudulent efforts to persuade and deviously control" prices in the silver market, which "should be prosecuted."  Commissioner Chilton indicated that the CFTC investigation was continuing and added that he was "hopeful that the agency will speak publicly about the investigation in the very near future."

**IV.**     **Other Market Factors Indicating a Conspiracy**

82.     Various factors make the market for COMEX silver futures and options contracts susceptible to a price fixing and market manipulation conspiracy.

### Standardized Product with High Degree of Interchangeability

83.     When products offered are viewed as interchangeable by market participants, it is easier to unlawfully agree on the price for the product in question, and it is easier to effectively

monitor agreed-upon prices. This makes it easier to form and sustain an unlawful anticompetitive agreement or conspiracy.

84.    Here, COMEX silver futures and options contracts are interchangeable. Indeed, the COMEX specifies the terms of each contract, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

**Defendants Had a Motive to Manipulate the Price
of COMEX Silver Futures and Options Contracts**

85.    Defendants specifically intended to manipulate the price of COMEX silver futures and options contracts during the Class Period. Upon information and belief, Defendants consistently took positions in their trading of COMEX silver futures and options contracts that would inure to their financial benefit. Defendants consistently profited from the artificially lower or suppressed COMEX silver futures prices because, throughout the Class Period, they maintained significant short positions in COMEX silver futures and options contracts.

86.    Upon information and belief, a significant portion of Defendants' short positions in the COMEX silver futures contracts were acquired through naked short selling, that is, Defendants would contract to sell in the future silver which they did not own or had made no provisions to borrow. Such naked short selling, unconstrained by the actual amount of silver owned or available to the short seller, enabled Defendants to more effectively suppress and manipulate COMEX silver futures and options contracts during the Class Period.

87.    It has been estimated by at least one commentator that Defendants' short positions are in excess of existing world inventories. As one prominent trader publicly testified:

> The size of the open interest in COMEX silver is irresponsibly
> large, given the reality of world inventories and production.
> Additionally, there is a significant imbalance between the largest
> long positions and the largest short positions, with the shorts being

heavily concentrated.  In a physically delivered futures contract for
a commodity of finite-supply, this also exposes the marketplace to
an unnecessary risk of failure-to-deliver. Such an event could
destroy the COMEX silver market.

88.     Because Defendants maintained significant naked short positions in COMEX

silver futures and options contracts, they were incentivized to keep prices depressed and roll-over

their massive short positions into succeeding months.  If prices for silver increased, Defendants

would be forced to cover their short positions and suffer enormous losses or deliver physical

silver in quantities well in excess of what was available in the market.

**Defendants Had the Opportunity to Conspire Through Their Participation in Trade
Associations**

89.     Participation in trade associations can foster and facilitate an unlawful

anticompetitive conspiracy.  Throughout the Class Period, Defendants participated in numerous

trade association activities and events together, which provided many opportunities to conspire

and share confidential information and trading strategy.

90.     For example, Defendants are members of the Futures Industry Association

(FIA"), the Futures and Options Association ("FOA") and the London Bullion Market

Association ("LBMA").

91.     HSBC USA and JPMFI are regular members of the FIA, a United States-based

industry advocacy and education organization whose regular members are all futures

commission merchants.  In addition, the FIA's board of directors includes the managing director

and global co-head of JPFMI's futures and options and OTC clearing, and Robert T. Cox, the

managing director and head of futures of HSBC USA.  Richard Berliand, the chairman of JP

Morgan Futures and Options and head of JP Morgan-Bear Stearns' prime brokerage business,

serves as a special advisor to the board.  As part of FIA, Defendants participate in the annual

Futures & Options Expo, the FIA/OIC Investor Education Day, the International Derivatives

Expo, and other events and meetings.

92.      HSBC Bank PLC and JPMS are members of the FOA, an industry association for

firms and institutions carrying on business in futures, options and other derivatives or which use

such products in their business.  FOA's principal role is to represent the interests of its members

in the public and regulatory domain and deliver a wide range of support services to the

membership.  Defendants participate in annual events and conferences such as International

Derivatives Week.  In addition, Richard Berliand of JPMFI serves as a special advisor to FOA's

Board.

93.      Both JP Morgan Chase and HSBC NA are also members of the LBMA, the

London-based trade association that represents the wholesale gold and silver bullion market in

London.

**Absent an Unlawful Conspiracy to Suppress and Manipulate the Price of COMEX Silver
Futures and Options Contracts, Defendants' Actions Were Contrary to Their Economic
Self-Interest**

94.      Each of the Defendants would have taken enormous short positions only if it

knew beforehand and was confident that the other Defendants would support it and take similar

short positions in the market for COMEX silver futures and options contracts.  Absent their

collusion, signaling and prior knowledge, it would not be in each of the Defendants' independent

economic self-interest to go out on a limb and take such enormous short positions.

## FRAUDULENT CONCEALMENT

95.      By its very nature, the unlawful activity, as alleged herein, that Defendants

engaged in was self-concealing. Defendants, *inter alia*, conspired and engaged in secret and

surreptitious activities in order to manipulate and make artificial prices for Comex silver futures and options contracts.

96.     Defendants fraudulently concealed their participation in their conspiracy to manipulate and make artificial the market for Comex silver futures and options contracts by, among other things, engaging in secret meetings and communications in furtherance of the conspiracies.  Because of such fraudulent concealment, and the fact that a conspiracy in restraint of trade is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

97.     Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy and manipulation.

98.     Plaintiff and members of the Class were lulled into believing that the prices at which they purchased and sold Comex silver futures and options contracts were the result of market conditions, rather than the product of Defendants' manipulation and collusive activities.

99.     Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until they became public in or around the time of Bart Chilton's October 26, 2010 public statement.

100.     At all relevant times and in all relevant respects, Plaintiff and other members of the Class exercised reasonable diligence.

101.    None of the facts or information available to Plaintiff and members of the Class prior to October 26, 2010, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint.

102.    Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in or about October 26, 2010.

103.    Because the alleged conspiracy to manipulate the price of COMEX silver futures and options contracts was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, did not know that the price of COMEX silver futures and options contracts had been artificially suppressed and had no knowledge of any facts or information that would have caused a reasonably diligent person to investigate whether the conspiracies existed until October 26, 2010.

104.    As a result of Defendants' conduct and concealment of their conspiracy to manipulate COMEX silver futures and options contracts, Plaintiff and members of the Class were prevented from learning of the facts needed to commence suit against Defendants for the manipulative and anticompetitive conduct alleged in this Complaint until October 26, 2010.

105.    Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiff and members of the Class from suing them for the anticompetitive activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## DEFENDANTS' ANTITRUST VIOLATIONS

106.    Beginning at least as early as June 1, 2008, and continuing until at least the date of the filing of the Complaint, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain, suppress, and/or stabilize the prices of COMEX silver futures and options contracts.

107.    In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, suppress and otherwise make artificial the price of COMEX silver futures and options contracts.  These activities included the following:

(a)     Defendants participated in meetings and/or conversations to unlawfully discuss the price of COMEX silver futures and options contracts;

(b)     Defendants agreed during those meetings and conversations to unlawfully sell COMEX silver futures contracts in order to drive down the price of COMEX silver futures contracts and otherwise to depress or make artificial the prices of  COMEX silver futures and options;

(c)     Defendants signaled to one another their intention to depress or otherwise make artificial the prices of  COMEX silver futures and options contracts and colluded with one another in achieving this unlawful and anticompetitive purpose; and

(d)     Pursuant to such an unlawful conspiracy in restraint of trade, Defendants knowingly and collusively traded in order to depress or otherwise make artificial the price of COMEX silver futures and options contracts.

## ALLEGATIONS OF ANTITRUST
## INJURY TO PLAINTIFF AND THE CLASS

108.   Defendants' anticompetitive conduct had severe adverse consequences on competition in that Plaintiff and other members of the Class who traded COMEX silver futures and options contracts during the Class Period were trading at artificially determined prices that were suppressed as a result of Defendants' unlawful conduct.  As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business or property.

## COUNT ONE

## VIOLATION OF COMMODITY EXCHANGE ACT, 7 U.S.C. § 1

109.   Plaintiff incorporates by reference the preceding allegations.

110.   Plaintiff and members of the Class sold COMEX silver futures contracts and/or purchased or sold options contracts during the Class Period at prices which were made artificial by Defendants' unlawful activities, and were injured as a result of Defendants' manipulation and suppression of the prices of those contracts.

111.   Defendants' activities constitute manipulation of the prices of COMEX silver futures and options contracts during the Class Period in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

112.   Defendants are liable to Plaintiff and members of the Class for the damages they sustained as a result of their CEA violations.

## COUNT TWO

## AIDING AND ABETTING VIOLATIONS OF
## COMMODITY EXCHANGE ACT, 7 U.S.C. § 25

113.   Plaintiff incorporates by reference the preceding allegations.

114.     Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation and suppression of COMEX silver futures and options contract prices, and willfully intended to assist these manipulations to unlawfully cause the price of COMEX silver futures and options contracts to be suppressed or to otherwise reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

115.     Defendants are liable to Plaintiff and the Class for the damages they sustained as a result of the CEA violations.

## COUNT THREE

## <u>VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT</u>

116.     Plaintiff incorporates by reference the preceding allegations.

117.     Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

118.     During the Class Period, Defendants possessed market power in the market for the sale of COMEX silver futures and options contracts.

119.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial prices for COMEX silver futures and options contracts.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

120.     Defendants' conspiracy, and resulting impact on the market for COMEX silver futures and options contracts, occurred in or affected interstate and international commerce.

121.     As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

122.     Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## RELIEF SOUGHT

Accordingly, Plaintiff demands relief as follows:

A.     That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.     That the unlawful conduct alleged herein be adjudged and decreed to be a violation of the CEA;

C.     That Plaintiff and the Class recover damages, as provided under the CEA, together with prejudgment interest;

D.     That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

E.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

F.     That Plaintiff and the Class recover damages, as provided under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

G.      That Plaintiff and the Class recover their costs of the suit, including attorneys'

fees, as provided by law; and

H.      That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

Dated:  December 16, 2010

**ZWERLING, SCHACHTER**
**& ZWERLING, LLP**


By:      _____s/Stephen L. Brodsky_____
          Robert S. Schachter (RS 7243)
          Stephen L. Brodsky (SB 4354)
          41 Madison Avenue
          New York, New York 10010
          Telephone: (212) 223-3900
          Facsimile: (212) 371-5969
          rschachter@zsz.com
          sbrodsky@zsz.com

          **CHIMICLES & TIKELLIS LLP**
          Steven A. Schwartz
          One Haverford Centre
          361 West Lancaster Avenue
          Haverford, PA 19041
          Telephone: (610) 642-8500
          Facsimile: (610) 649-3633
          SAS@chimicles.com

          *Counsel for Plaintiff and the Proposed Class*